**STEPTOE LLP**
Jeff Potts (TX Bar No. 00784781)
717 Texas Avenue, Suite 2800
Houston, TX 77002
Telephone:    (713) 221-2300
Email:        jpotts@Steptoe.com

Stacie R. Hartman (*PHV application forthcoming*)
John J. Byron (TX Bar No. 24078296)
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone:    (312) 577-1300
Email:        shartman@Steptoe.com
              jbyron@Steptoe.com

Joshua R. Taylor (*PHV application forthcoming*)
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:    (202) 429-3000
Email:        jrtaylor@Steptoe.com

*Counsel to Periscope Capital Inc.*
*and Spring Creek Capital LLC*

IN THE UNITED STATES BANKRUPTCY COURT FOR
THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **FINANCIAL STRATEGIES ACQUISITION** | § | Case No. 23-42345 |
| **CORP.** | § | |
| Last 4 Digits of Tax ID No. (2560) | § | |
| 7503 Maribeth Drive, Dallas, Texas 75252 | § | Chapter 11 |
| | § | |
| DEBTOR | § | |

**OBJECTION OF PERISCOPE CAPITAL INC. AND**
**SPRING CREEK CAPITAL LLC TO MOTION TO COMPEL**
**[Relates to Docket No. 12]**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Periscope Capital Inc. ("Periscope") and Spring Creek Capital LLC ("Spring Creek," and

with Periscope, the "Interested Parties) hereby object to the Motion to Compel [ECF No. 12] filed

by the Debtor Financial Strategies Acquisition Corporation (the "Debtor" or the "Company").[1] The Motion asks the Court to compel J.P. Morgan Chase Bank ("Chase Bank") to deliver money to the Debtor that is not its own property. The Chase Bank account is a trust account that holds money contributed and owned by Spring Creek, funds advised by Periscope, and other entities. The Motion to Compel should be denied to allow for return of the money to its rightful owners.

Given the less-familiar context of this matter arising from a special purpose acquisition company ("SPAC"), we provide a more detailed introduction and background for the Court.

## INTRODUCTION

1.      The Debtor is a failed SPAC. The Company was formed for the purpose of identifying and combining with a business in the FinTech or financial services industries. To raise capital for the potential business combination, the Company made an initial public offering ("IPO") of its shares. As with other SPACs, the proceeds from the IPO were paid into a trust account to be used either to complete a business combination or to redeem the shares of the public shareholders. Because of the uncertainty about the ultimate business combination, the trust arrangement protected the public shareholders by (a) giving them an election to participate in the business combination if one was announced and (b) providing for the return of their capital if they decided not to participate in the business combination or the Company failed to effect one within the time required to do so.

2.      The public shareholders provided the Company two years to identify an acquisition target in line with the Company's representations at the time of the IPO. The Company failed to do so. Although the Company told the public shareholders it would identify a potential business

---

[1] Periscope is the investment adviser to several funds, who have designated Periscope to take legal action on behalf of the funds. By submitting this Objection, the Interested Parties do not concede that this case is properly before this Court, and instead submit this Objection to protect their interests affected by the Motion. They reserve all rights with respect to all matters in this case.

combination with a FinTech or financial services business, the Company instead announced a potential business combination with a bioscience company affiliated with the SPAC's sponsors. The Company also originated a series of "loans" with the SPAC sponsors and incurred other liabilities.  The proposed business combination with the sponsor-affiliated bioscience company was not put to a shareholder vote and has not moved forward.  The time for consummating a business combination has now expired.

3.      When it became apparent the proposed combination would not move forward in the required time, the Company filed a voluntary petition for reorganization under Chapter 11 – despite having zero operations and virtually no assets.  The Company filed this case in a thinly-veiled attempt to hoodwink the public shareholders and enrich the SPAC sponsors and its management. The Company seeks to access the money of the public shareholders held in trust, in order – improperly – to pay its sponsors and management, who are listed as "creditors," more than $1,250,000; to wipe out liabilities it incurred on its failed endeavor; and to move forward with a business combination with the sponsor-affiliated company.

4.      In a motion that is barely more than a page, the Company attempts to pull a fast one on this Court.  The Company moves the Court to compel Chase Bank to move the public shareholders' money held in trust to a Debtor-in-Possession account at East West Bank.  The Company knows that the money in trust is owned by the public shareholders, but tried to evade scrutiny by *not providing notice to a single one of its public shareholders*.  The Court should deny the Motion.  Not only is the Company's conduct surrounding the Motion improper, the money in trust is not property of the Company or Debtor's estate.  In accordance with the express terms of the trust agreement, the money is property of the public shareholders that should be returned to them.

**BACKGROUND**

5.     This is not an ordinary bankruptcy case because it involves a SPAC and less-traditional equity holders.   The investment structure of a SPAC plays an important role in establishing that the Debtor has no rights in the money held in the trust account at Chase Bank. The Interested Parties, therefore, start with an explanation of the mechanics of a SPAC, which other courts have found important to their analyses of SPAC investments.

I.     **The Mechanics of a SPAC**

6.     A SPAC is a company formed to raise capital with the purpose of using the capital to effect a business combination with an unspecified business to be identified at a later time. *Moradpour v. Velodyne Lidar, Inc.*, 2022 WL 2391004, at *1 (N.D. Cal. July 1, 2022).   SPACs offer an efficient path for a private company to access the public equity markets without a traditional IPO.   *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 699 (Del. Ch. 2023).   For the SPAC's management team (or sponsor), SPACs create the potential for substantial profit on nominal invested capital.   *Id.*   And for the investors who purchase SPAC shares as part of the IPO, SPACs provide the chance to invest early in an emerging company's lifecycle with the possibility of realizing significant upside on that investment.   *Id.*

7.     At the time of a SPAC IPO, the ultimate investment opportunity is unknown to the public shareholders.   *Id.*   The SPAC structure puts safeguards in place for the public investors through the establishment of a trust.   *Moradpour*, 2022 WL 2391004, at *1.   The proceeds raised in the IPO initially are placed in a trust account.   *Id.*   If the SPAC finds a target company and agrees to a business combination, the SPAC holds a shareholder vote.   *Id.*   If the shareholders approve the business combination, each public shareholder is given the option to either participate as an investor in the combined business or to redeem its shares for a return of its investment money

held in trust. *Id.* If the SPAC does not find a target company within the required time period (12 months from the date of the IPO, unless extended), then all of the shares of the public shareholders are redeemed with a return to them of their investment money held in trust. *Id.* The SPAC structure puts the risk of a failure to identify an attractive business combination on the SPAC and its sponsor.

8.     The SPAC structure and protection of the public shareholders' investments are important to the SPAC ecosystem. If the public shareholders had to put at risk their capital before knowing the details of the ultimate business combination, investments in SPACs would almost assuredly dry up. In the absence of investment protection, no reasonable investor would purchase shares in the IPO based solely on the sponsor's track record and experience. In addition, there would be little to guard against the SPAC and its sponsor from squandering the IPO proceeds in pursuit of a business combination. The SPAC structure aligns incentives and promotes the availability of capital for companies early in the lifecycle. If the risk allocation is thrown off balance, that would likely trigger the end of the SPAC market.

## II.     The Formation, Private Placement, and IPO of the Company

9.     The Company was incorporated in Delaware on July 1, 2020, with a specified purpose of identifying and effecting a business combination with a business in the FinTech or financial services industries. Ex. 1, Prospectus at 2 (Dec. 21, 2021). To raise capital for the potential business combination, the Company initiated both a private placement and an IPO of its securities.

10.     In the private placement, the Company's co-sponsors, FSC Sponsor LLC and Celtic Sponsor VII LLC (the "Sponsors"), and other anchor investors agreed to purchase 459,275 units (or 504,950 units if the over-allotment option was exercised in full), with each unit consisting of one share of Class A common stock, one redeemable warrant, and a right to purchase a fractional

share of Class A common stock.  *Id.* at Cover Page.[2]  These netted the Company $4,592,750 (or

$5,049,500 if the over-allotment option was exercised in full) to cover expenses.  *Id.*

11.    To supplement the private placement, the Company launched an IPO and offered

8,700,000 units to public investors and an additional 1,305,000 units to the underwriter of the IPO

to cover over-allotments for a total of 10,005,000 shares if the over-allotment option was exercised.

*Id.* at Cover Page & 6.  The IPO would yield approximately $100,050,000 in gross proceeds if

fully subscribed.  *Id.* at 67.  To attract public investors, the Company provided assurances typical

of SPACs to the public investors.  Primarily, the Company assured public investors that any money

they contributed as part of the IPO would be placed in a trust account with Continental Stock

Transfer & Trust Company ("Continental") acting as the trustee.  *Id.* at 13, 67.  The money in the

trust account would only be used for a business combination (if the public investor chose to

participate) or to redeem the stock of the public investors if the Company was unable to timely

complete a business combination or if the public investor chose not to participate in the proposed

business combination.  *Id.* at 14.  In other words, none of the public investor money in the trust

account would be available for the Company's use "unless and until" the company completed a

business combination (aside from modest interest on the trust proceeds available to the Company

to pay taxes).  *Id.* at 15.

12.    The Company also assured public investors that it would have sufficient funds from

the private offering and other investments or loans from its Sponsors and management team to

---

[2]  The initial stockholders also received 2,501,250 shares of Class B common stock (or founder shares) (up to 326,250 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option was exercised) for nominal consideration, which would automatically convert into shares of Class A common stock at the time of a business combination.  *Id.* at 10.

cover the expenses of the IPO and to pursue and effect a business combination. *Id.* at 15, 67.[3] If the Company was unable to cover those expenses for whatever reason, the Company reassured investors that its Sponsors had agreed to step in and cover the Company's liabilities. *Id.* at 25

13.    On December 14, 2021, the Company consummated its IPO of 10,005,000 units, which included the full exercise of the underwriters' over-allotment option, generating gross proceeds of $100,050,000 (before underwriting discounts and commissions and offering expenses). Ex. 2, Form 8-K at Item 99.2, Press Release (Dec. 14, 2021). Based on the Company's assurances and traditional SPAC protections, Spring Creek and funds advised by Periscope purchased units in the IPO.

**III.    Placement of IPO Proceeds in Trust and Investment Management Trust Agreement**

14.    The net proceeds from the IPO and certain proceeds from the private placement were placed in a trust account managed by Continental. *Id.* at Item 8.01 (Dec. 15, 2021). The total amount of money placed in the trust account was $101,050,500, which included the entire principal investment of the public shareholders and certain proceeds of the private placement proceeds.[4] *Id.* In announcing placement of that money into the trust, the Company affirmed that none of the funds would be released unless and until either a business combination or redemption occurs. *Id.*

15.    Before completion of the IPO, the Company entered into an Investment Management Trust Agreement with Continental. Ex. 3, Investment Management Trust Agreement (Dec. 9, 2021) ("Trust Agreement"). The Trust Agreement stated that an aggregate of $101,050,500 (assuming full exercise of the underwriters' over-allotment) of proceeds of the IPO

---

[3]  At the time of the IPO, the Company had borrowed $200,000 from co-Sponsor FSC and $250,000 from an individual affiliated with that entity, Emil Assentato. *Id.* at 69.

[4]  The remaining amounts raised from the private placement were used to pay underwriting commissions ($2,501,250 with the overallotment option), offering expenses ($1,297,750) and reserved for working capital ($250,000). Ex. 1, Prospectus at 67.

and the private placement would "be delivered to the Trustee to be deposited and held in a segregated trust account" for the benefit of the Company and public shareholders (the "Beneficiaries"). *Id.* at p. 1 (recital 4).

16.    The Trust Agreement specified that the trust proceeds would be placed in a trust account (the "Trust Account") at Chase Bank and that it governed when and to whom the trust proceeds would be distributed by Continental. *Id.* at § 1. According to the Trust Agreement, Continental was required:

- On consummation of a business combination and receipt of a termination letter substantially in the form of Exhibit A to the Trust Agreement, commence and "complete the liquidation of the Trust Account and distribute the Property in the Trust Account, including interest not previously released to the Company to pay its taxes . . . , as directed in the [t]ermination [l]etter" after redeeming the shares of the public stockholders who chose not to participate in the business combination. *Id.* at §§ 1(i), (l) & Ex. A.

- On receipt of a termination letter substantially in the form of Exhibit B to the Trust Agreement, or a failure to complete a business combination within 12 months of the closing of the IPO (or 18 months of closing of IPO if the Company extended the time to complete a business combination), commence and "complete the liquidation of the Trust Account and distribute the Property in the Trust Account, including interest not previously released to the Company to pay its taxes (less up to $100,000 of interest that may be released to Company to pay dissolution expenses)," to the public shareholders. *Id.* at § 1(i) & Ex. B.

- "Upon written request from the Company, . . . distribute to the Company the amount

of interest income earned on the Trust Account requested by the Company to cover

any income or other tax obligations owed by the Company." *Id.* at § 2(a).

These terms made clear that the Company had no rights to the money in the Chase Bank Trust

Account, aside from interest on the trust money to pay taxes, unless and until it either consummated

a business combination or the shares of nonparticipating public shareholders were redeemed.  If

the Company failed to effect a business combination, the trust proceeds and any interest not used

to pay taxes or dissolution expenses remained property of the public shareholders and was to be

returned to them.

## IV.    Failure of the Company to Effect a Business Combination

17.    The Company was required to complete a business combination within 12 months

of the closing of the IPO, and had the option to extend that period 2 times, each by 3 months (for

a total of 18 months), for $1,000,500 per extension (if the underwriter's over-allotment was

exercised in full).  Ex. 1, Prospectus at 3.  The Company was unable to identify and complete a

business combination within the required time.

18.    On November 14, 2022, the Company filed a definitive proxy statement informing

its shareholders it would hold a special meeting to vote on amendments to the Company's

Amended and Restated Certificate of Incorporation and to the Trust Agreement to extend the

deadline by which to identify and complete a business combination up to 11 times in one month

increments or until December 14, 2023.  Ex. 4, Form 8-K at Item 1.01 (Dec. 13, 2022).[5]  In

exchange for the extension, the Company agreed to pay into the Trust Account, for the benefit of

the public shareholders, the lesser of $50,000 and $0.05 per public share not redeemed in

---

[5]  A copy of the amendment to the Trust Agreement is attached as Exhibit 5.  The amendment did not
change the material terms of the Trust Agreement other than by providing the Company until no later than
December 14, 2023 to complete a business combination.

connection with the amendment request for each one-month extension it requested. *Id.* To fund that obligation, one of Company's co-Sponsors (Temmelig Investor LLC) agreed to loan the Company up to $600,000. *Id.*

19. On December 9, 2022, the shareholders voted to approve the extension amendments. *Id.* In connection with the amendment to the Amended and Restated Certificate of Incorporation, the holders of 9,387,982 public shares exercised their right to redeem their shares for an aggregate redemption of approximately $95,484,415.86. *Id.* at Item 5.07. After the redemption, approximately $6,275,640.84 remained in the Trust Account at Chase Bank. *Id.*

## V.    The Proposed Business Combination with an Affiliate of the Sponsor and Failure to Complete the Proposed Business Combination

20. On February 13, 2023, the Company announced it had entered into a business combination agreement with Austin Biosciences Corp. ("Austin Bioscience"). Ex. 6, Form 8-K at Item 99.1 Press Release (Feb. 13, 2023). This was improper for at least two reasons: Austin Bioscience was outside of the designated FinTech and financial services industries, and the company is affiliated with the Company's Sponsors and shares both officers and directors.

21. The Company never brought its proposed business combination to a shareholder vote. The Company paid money into the Trust Account to obtain extensions to the applicable deadline to conclude a business combination, which expired by no later than November 14, 2023. Ex. 7, Form 8-K (June 15, 2023) at Item 2.03 (extending deadline to July 14, 2023).[6]

---

[6] Although the Company announced seven extensions through SEC filings, it announced an eighth extension, through August 14, 2023, in a press release that was not filed with the SEC. Ex. 8, Press Release (July 18, 2023). Based on information and belief, the Company obtained two additional extensions, and the time to complete a business combination expired on November 14, 2023. Regardless, the outside time to complete a business combination (assuming all extensions were exercised) was December 14, 2023. Ex. 4, Form 8-K at Item 1.01 (Dec. 13, 2022). The Company did not complete a business combination by that date either.

## VI.    The Bankruptcy Petition and Attempt to Compel the Money in the Trust Account Without Notice to the Public Shareholders

22.     On November 13, 2023, the Company filed a Chapter 11 Voluntary Petition in the United States Bankruptcy Court for the Northern District of Texas.  *In re Financial Strategies Acquisition Corp.*, No. 23-32655.  That bankruptcy case was dismissed because the Company failed to file the information required by the court.

23.     On December 6, 2023, the Company refiled its Chapter 11 Voluntary Petition in this Court.  ECF No. 1.  The Company's Chief Executive Officer, who signed the Chapter 11 Voluntary Petition, is listed as a managing director of one of the Company's co-Sponsors and as Chairman of Austin Bioscience.[7]  In its schedule of creditors, the Company states that there are unsecured creditors who have approximately $2.7 million in claims.  ECF No. 14, Schedule E/F: Creditors Who Have Unsecured Claims at 4 (Jan. 18, 2024).  Among those creditors, the Company lists both of its Sponsors (FSC Sponsor LLC and Temmelig Investors LLC) and at least five other individuals and entities affiliated with the Sponsors or target  (Celtic Asset & Equity Partners, Ltd., Jamie Khurshid, Emil Assentato, Greg Gaylor, and James Story) who the Company claims are owed in excess of $1,250,000 – and on whose behalf the Company attempts to recover in this case.

24.     On January 12, 2024, the Company filed the Motion asking the Court to compel Chase Bank to move funds held by the bank to a Debtor-in-Possession account at East West Bank.  ECF No. 12, Motion to Compel at 1 (Jan. 12, 2024).  Remarkably, despite knowing that the money at Chase Bank is being held in a Trust Account for the benefit of the public shareholders, the Company provided zero notice of its Motion to any public shareholder.  Equally as important, the Company neglects to apprise the Court that the money at Chase Bank is being held in trust, and

---

[7]  Austin Biosciences Corp., Management, https://austinbio.tech/management/.

also affirmatively misrepresents that "[t]he funds represent property of the estate." *Id.* at 2. Because the money at Chase Bank is not property of the Company and is property of the public shareholders, including the Interested Parties, they object to the Motion.

## OBJECTION

25.     The Court should deny the Motion because the Company is seeking to compel the turnover of funds that it does not own. The money in the Chase Bank Trust Account was paid into that account for the benefit of the public shareholders unless and until – as never occurred – the Company timely effected a business combination and the public shareholders elected to participate. The Company did not consummate a business combination, and the time by which the Company was required to do so expired by no later than November 14, 2023. *See* fn 6, *supra* at 10. Pursuant to the express terms of the Trust Agreement, the money should be returned to the public shareholders and not transferred to the Debtor-in-Possession account to enrich the Sponsors and their affiliates.

**I.     The Bankruptcy Code and Precedent Demonstrate that the Money in the Chase Bank Trust Account Is Not Property of the Estate**

26.     Section 541 of the Bankruptcy Code defines property of the estate to include the "legal or equitable interests of the debtor in property as of the commencement" of the bankruptcy proceeding. 11 U.S.C. § 541(a). In other words, the estate succeeds only to title and rights of the debtor in "property at the time [it] filed [its] petition." *In re Pitcock*, 208 B.R. 862, 865 (Bankr. N.D. Tex. 1997).

27.     When property is held in trust, the debtor's "estate relative to the [t]rust is limited to the debtor's beneficial interest in the [t]rust." *In re Simon*, 179 B.R. 1, 5-6 (Bankr. D. Mass. 1995). Put differently, "property held in trust for another is not property of the estate under 11 U.S.C. § 541 in the event of . . . bankruptcy." *In re Sakowitz, Inc.*, 949 F.2d 178, 181 (5th Cir.

1991); *see also In re Marrs-Winn Co.*, 103 F.3d 584, 589 (7th Cir. 1996) ("[O]ne can easily

conclude that the debtor's bankruptcy estate does not include property held in trust for another.").[8]

Even when a debtor possesses the property, the trust property is not property of the estate if held

in trust for another. *See Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not

own an equitable interest in property which he holds in trust for another, that interest is not

'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983)

("Congress plainly excluded [from the estate] property of others held by the debtor in trust at the

time of the filing of the petition."); *In re Maple Mortgage, Inc.,* 81 F.3d 592, 595 (5th Cir. 1996)

(*citing Begier v. IRS*, 496 U.S. 53, 59 (1990)) ("Because a debtor does not own an equitable interest

in property he holds in trust for another, that interest is not 'property of the estate.'"); *In re Haber

Oil Co., Inc.,* 13 F.3d 426, 435 (5th Cir. 1994) (property held by a debtor in trust held for the

benefit of another is not property of the estate)

28.     The issues of whether the money at Chase Bank is being held in trust and the

identity of the beneficial interest holders are governed by state law. *Butner v. United States*, 440

U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").[9]  The Company

carries the burden of establishing that the money in the Chase Bank Trust Account is property of

the estate, which must be done by "clear and convincing evidence." *Cash Am. Pawn, L.P. v.

Murph*, 209 B.R. 419, 421 (E.D. Tex. 1997).

29.     The Company has not satisfied its burden in the Motion, nor could it.  New York

law applies to the Trust Agreement.  Ex. 3, Trust Agreement at § 7(b).  A valid "express trust"

---

[8]  *See also Wickes Boiler Co. v. Godfrey-Keeler Co.*, 116 F.2d 842, 844 (2d Cir.1940) (Bankruptcy priorities
apply only to property of the estate, and not to trust funds of which third parties are the beneficial owners);
*In re Georgian Villa, Inc.*, 10 B.R. 79, 83-84 (Bankr. Ga. 1981) (holding that where it appears the debtor
has no beneficial interest in the property held in trust, it should be turned over to the true owner).

[9]  *See also In re Royal Business School, Inc.*, 157 B.R. 932, 940 (Bankr. E.D.N.Y. 1993).

exists under New York law, as is the case here, when there is "(1) a designated beneficiary, (2) a designated trustee, (3) a fund or other property sufficiently designated or identified to enable title of the property to pass to the trustee, and (4) actual delivery of the fund or property, with the intention of vesting legal title." *In re Doman*, 890 N.Y.S.2d 632, 534 (2d Dep't 2009).

30.      There can be no doubt that an express trust was established to hold the IPO proceeds.  The Trust Agreement designates the public stockholders as beneficiaries, as discussed further below.  Ex. 3, Trust Agreement at p. 1 (recital 4).  It also designates Continental as the trustee.  *Id.*  The Trust Agreement identifies both the property, $101,050,500 (with the exercise of the underwriter over-allotment), as well as the trust account into which the trust money would be deposited, the Chase Bank account.  *Id.* at p. 1 (recital 4) & § 1(a).  And, the money designated as the trust property was actually delivered to the Trust Account.  Ex. 2, Form 8-K at Item 8.01 (Dec. 15, 2021).

31.      The Trust Agreement that governed the express trust established not only who owned what beneficial interest in the trust property, but also at what time.  According to Sections 1 and 2, the Company did not have any interest in the principal balance of the Trust Account unless and until the Company consummated a business combination and public shareholders who elected redemption redeemed their shares.  Ex. 3, Trust Agreement at §§ 1-2; Ex. 5, Amendment to Trust Agreement at § 1.1.  While the Company had limited rights to the interest on the principal balance in the Trust Account to pay taxes, that interest was extinguished when the Company failed to effect a business combination on November 14, 2014.  .  Ex. 7, Form 8-K (June 15, 2023) at Item 2.03; Ex. 8, Press Release (July 18, 2023); *supra* n.5.  At that time, the Trust Agreement provided that the entirety of the money in the Trust was owed to the public stockholders (aside for up to $100,000 of any interest to pay dissolution expenses).  Ex. 3, Trust Agreement at §§ 1-2; Ex. 5, Amendment

to Trust Agreement at § 1.1.  As a result, when the Company filed its petition for voluntary

bankruptcy in this case on December 6, 2023, the Company did not have any interest in the money

in the Chase Bank Trust Account, other than potentially up to $100,000 of any remaining interest

earned in the Trust Account to cover dissolution expenses.  Since the Company has not undertaken

a dissolution, the entirety of the money in the Chase Bank Trust Account is property of the public

shareholders – not of the debtor.[10]

## II.    Case Law Outside of the Bankruptcy Context Confirms that the Money in the Chase Bank Trust Account Is Not Property of the Estate

32.    Outside of the bankruptcy context, courts have adjudicated when the proceeds of a

SPAC IPO are owned by the public shareholders versus owned by the SPAC.  Specifically, outside

of bankruptcy, courts have found that property in the Trust Account is not property of the SPAC

in circumstances similar to those here.  In *In re MultiPlan Corp. Shareholders Litigation*, a SPAC

raised $1.1 billion and placed those funds in trust, same as happened here.  268 A.3d 784, 795

(Del. Ch. 2022).  Similar to this case, the funds were unavailable to the SPAC "[u]nless and until"

the SPAC completed an initial business combination.  *Id.*  There, two shareholders sued the

SPAC's officers, directors, and controlling stockholder, alleging claims for breach of fiduciary

duty and that defendants had impaired the shareholders' informed exercise of their redemption and

voting rights by issuing a false and misleading proxy.  *Id.* at 798-99.

---

[10] *See, e.g., In re Ward*, 300 B.R. 692, 698 (Bankr. S.D. Ohio 2003) ("An express trust, from its inception, excludes a beneficiary's ownership interest from being a part of the property which constitutes a debtor's estate in a bankruptcy case"); *In re Carrozella & Richardson*, 255 B.R. 267, 276 (Bankr. D. Conn. 2000) ("[W]here an express trust has been created, the debtor-trustee should be presumed to have answered the defendant-beneficiary's request for reconveyance of trust funds with payment of trust funds."); *In re Krause*, 349 B.R. 255, 259 (Bankr. D. Kan. 2006) (similar); *see also Conn. Gen. Life Ins. v. Universal Ins. Co.*, 838 F.2d 612, 618 (1st Cir. 1998) (noting when a debtor has served as the trustee of an express trust prior to bankruptcy, the trustee must "fork over" the assets to the beneficiary as the debtor generally has no rights to the assets kept in trust).

33.     As a threshold issue, the court analyzed whether the fiduciary duty claims were direct or derivative claims. *Id.* at 801-802.  Key to the court's determination was whether the injury to the shareholders was independent of any alleged injury of the SPAC; the court concluded that the shareholders had alleged a harm independent of and not shared with the SPAC. *Id.* at 802. The court reached this conclusion based on the claims' being centered around the exercise of redemption rights, and the fact that the SPAC "had no redemption rights and ***the public stockholders' funds held in trust did not belong to the SPAC until the stockholders opted not to redeem but to invest in the post-merger combined entity***." *Id.* (emphasis added).[11]

34.     The Court should reach a similar conclusion here: the Chase Bank Trust Account funds are not property of the Debtor and therefore not property of the estate.  Any transfer of such funds to the Debtor would be unlawful.

## III.    Equitable Principles Further Support that the Money in the Chase Bank Trust Account Is Not Property of the Estate

35.     As this Court well knows, bankruptcy courts are courts of equity. *In re Cano*, 410 B.R. 506, 533, 537 (Bankr. S.D. Tex. 2009).  Section 105(a) of the Bankruptcy Code "empowers the bankruptcy court to exercise its equitable powers – where 'necessary' or 'appropriate' – to facilitate the implementation of other Bankruptcy Code provisions."  Id. at 537 (quoting *In re Ludlow Hosp. Soc'y, Inc.*, 124 F.3d 22, 27 (1st Cir. 1997).

36.     In addition to the straightforward application of the law, equity supports denial of the Motion to Compel.  It is apparent that the Company is attempting to use the bankruptcy process

---

[11]  Other courts similarly have found that trust property is not the SPAC's property. *See, e.g.*, *Laidlaw v. GigAcquisitions2, LLC*, 2023 WL 2292488, at *6 (Del. Ch. Mar. 1, 2023) ("This injury could not run to the corporation: the funds at issue belong to public stockholders, not the SPAC. Any recovery would flow to stockholders because the 'improperly reduced value' is the loss of their own cash from the trust."); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 701, 710 (Del. Ch. 2023) ("The loss of value involves the public stockholders' funds held in trust, which do not belong to the Company until after redemption requests are satisfied.").

to access property that does not belong to it.  Its reason: more than $1.25 million in "creditor" claims would be paid to the benefit of the Company, its Sponsors, and their affiliates.  ECF No. 14, Schedule E/F: Creditors Who Have Unsecured Claims at 1-4 (Jan. 18, 2024).  The Company also is using this Chapter 11 case in an effort to fund a business combination with Austin Bioscience – a company affiliated with the Sponsor – with the public shareholders' money and which the public shareholders have not approved.  ECF No. 29, Disclosure Statement (Feb. 2, 2024).  The Court should not permit the Company and its affiliates to line their own pockets at the expense of the public shareholders, and turn upside down the SPAC investment structure to pursue a business combination that the public shareholders did not elect to fund.

37.     Denial of the Motion is especially critical because of its potential consequences for the SPAC market.  The intent and placement of the funds – in trust for the public shareholders – is the foundation of this type of business transaction where a SPAC, the Debtor in this case, is created for the sole purpose of finding a business combination option.  Absent a business combination, there would be no need for the millions of dollars invested – which in this case exceeded $100 million.[12]  In a SPAC transaction, investors commit money to a potential future investment to obtain the potential upside if presented with a business combination attractive to them.  In the absence of a proposed business combination, or if the proposed option lacks appeal, investors maintain the right to redeem their initial investment from the trust account.  The trust both safeguards investor funds during the exploration phase and enables the SPAC to engage in meaningful negotiations for potential business combinations.  Without the vehicle of a trust, the

---

[12]  The SPAC sponsor typically provides additional funding for the anticipated costs and expenses to be incurred prior to a business combination.

ability of a SPAC to effectively pursue and finalize business combinations would be significantly compromised.

38.     Underlying all of this is that, if investor funds were not protected during the solicitation period, investors would not put millions of dollars at risk of being misspent by the SPAC.   The protection of investor funds during the solicitation period is thus a cornerstone of investor confidence in SPAC transactions.  If the shareholders' millions of dollars are just handed over to a debtor SPAC that failed to meet its obligations, this runs the risk of destroying the SPAC market – no one would ever invest in a SPAC if its funds simply operated as insurance for failures of the SPAC and its sponsors.  And allowing a SPAC and its sponsors to feather their nests with investor funds would be an affront to investor protection and the equity markets.

## LOCAL RULE 9014-1

39.     To the extent that Local Rule of Bankruptcy Procedure 9014-1(b)(2) requires a response to the enumerated paragraphs of the Motion to Compel, the Interested Parties respond as follows:

40.     Interested Parties admit that the Bankruptcy Court's docket reflects that Debtor filed a voluntary petition on December 6, 2023 for relief under Chapter 11 of the United States Bankruptcy Code, and lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 1.

41.     Interested Parties deny the allegations in Paragraph 2.

42.     Interested Parties lack sufficient knowledge or information to admit or deny the allegations in Paragraph 3.

43.     Interested Parties lack sufficient knowledge or information to admit or deny the allegations in Paragraph 4.

44.     Interested Parties lack sufficient knowledge or information to admit or deny the allegations in Paragraph 5.

45.     Interested Parties lack sufficient knowledge or information to admit or deny the allegations in Paragraph 6.

46.     Interested Parties deny the allegations in Paragraph 7.

47.     Interested Parties lack sufficient knowledge or information to admit or deny the allegations in Paragraph 8.

48.     Interested Parties deny the Debtor is entitled to any relief requested in the Motion to Compel's prayer for relief.

## **CONCLUSION**

For the reasons set forth above, Periscope and Spring Creek respectfully request that the Court deny the Motion and award any additional relief to which they may be entitled, whether at law or in equity.

Date:  February 9, 2024                          Respectfully submitted,


                                                 */s/ John J. Byron*
                                                 **STEPTOE LLP**
                                                 Jeff Potts
                                                 Texas Bar I.D. No. 00784781
                                                 717 Texas Avenue, Suite 2800
                                                 Houston, TX 77002
                                                 Telephone: (713) 221-2300
                                                 Email: jpotts@Steptoe.com

                                                 -and-

                                                 Stacie R. Hartman (*PHV application forthcoming)*
                                                 John J. Byron (TX Bar No. 24078296)
                                                 227 West Monroe Street, Suite 4700
                                                 Chicago, IL 60606
                                                 Telephone: (312) 577-1300
                                                 Emails: shartman@Steptoe.com
                                                          jbyron@Steptoe.com

- and –

Joshua R. Taylor (*PHV application forthcoming*)
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Email: jrtaylor@Steptoe.com

*Counsel to Periscope Capital Inc. and Spring Creek
Capital LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Eastern District of Texas on all parties registered to receive notice through the Court's ECF service, by email to the email addresses listed below, and by first class mail on certain other parties to the addresses listed below:

| | |
|---|---|
| Eric A. Liepens<br>Eric A. Liepins, P.C.<br>12770 Coit Road<br>Suite 850<br>Dallas, TX 75251 | John M. Vardeman,<br>U.S. Trustee<br>Office of the U.S. Trustee<br>110 N. College Ave., Suite 300<br>Tyler, TX 75702 |
| C. Josh Osborne and Eric T. Haitz<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, TX 76102 | Sam Della Fera, Jr.<br>Chiesa Shahinian & Giantomasi PC<br>105 Eisenhower Parkway<br>Roseland, NJ 07068 |
| Jennifer A. Gehrt<br>Barbee & Gerhrt, L.L.P.<br>PO Box 224409<br>Dallas, TX 75222 | Jason M. Rudd and Catherine A. Curtis<br>Wick Phillips Gould & Martin, LLP<br>3131 McKinney Avenue, Suite 500<br>Dallas, TX 75204 |
| Brian Schatz<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10002 | Anna G. Rotman and Tabitha De Paulo<br>Kirkland & Ellis LLP<br>609 Main Street<br>Houston, TX 77002 |
| Mark Harmon<br>Chiesa Shahinian & Giantomasi PC<br>11 Times Square, 34th Floor<br>New York, NY 10036 | Charles B. Hendricks and<br>Christopher J. Volkmer<br>Cavazos Hendricks Poirot, P.C.<br>Suite 570, Founders Square<br>900 Jackson Street<br>Dallas, TX 75202 |
| <u>Served by US Mail on:</u><br>US Trustee<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242 | <u>Served by US Mail on:</u><br>Continental Stock Transfer & Trust Company 1<br>State Street, 30th Floor<br>New York, NY, 10004 |
| <u>Served by Email on:</u><br>Chase Bank c/o Greg Sutton<br>gregory.e.sutton@jpmchase.com | |

/s/ *John J. Byron*
John J Byron